608 So.2d 1351 (1992)
Wanda C. STRINGER
v.
Earl S. LUCAS and Felix Tate.
Wanda C. Stringer, Darryl Johnson, Marcus Peterson, Carrie Haywood, and Monica Micou
v.
Earl S. Lucas and Felix Tate.
Nos. 89-CA-1216, 89-CA-1127.
Supreme Court of Mississippi.
October 1, 1992.
Rehearing Denied December 10, 1992.
*1352 Alma C. Campbell, Memphis, Willie J. Perkins, Sr., Greenwood, for appellant.
C. Ray Scales, Jr., C. Ray Scales, Jr. & Associates, Jackson, for appellees.
Before DAN M. LEE, P.J., and PRATHER and PITTMAN, JJ.
PITTMAN, Justice, for the Court:
This action arises out of the June 6, 1989, municipal general election for the City of Mound Bayou, Mississippi, for the offices of mayor and alderman. Wanda Stringer, one of the appellants herein, received the greatest number of votes in the election for mayor. In this expedited appeal, brought by Wanda Stringer, Darryl Johnson, and others, we affirm in part, reverse and render in part, and reverse and remand in part. Finding that the lower court's summary judgment disqualifying Stringer was appropriate, we affirm. However, we reverse the lower court's summary judgment declaring Lucas the winner of the mayoral race and render this cause for a special election. Likewise, we reverse and render the lower court's Rule 11(b) sanctions placed on Stringer. Finally, we reverse the directed verdict granted in favor of Tate and remand the outcome of the alderman's race for jury determination.

I.
In 1984, Wanda Stringer was elected to serve on the Bolivar County Election Commission, a post that she held throughout this appeal.[1] On March 19, 1985, Stringer was appointed to serve on the City of Mound Bayou Election Commission for the June 1985 election. According to Stringer, her duties with respect to this commission ended after the June 1985 election. On July 2, 1985, Wanda Stringer was appointed City Clerk for the City of Mound Bayou and assumed, among other things, the position of city voting Registrar. She resigned this position on July 1, 1988.
On February 7, 1989, incumbent Mayor Earl Lucas and the Board of Aldermen (Felix Tate, Harold Ward, Lawrence Thompson, Herman Johnson and Annyce Campbell) appointed three city employees (Joseph Woods, the Director of Sanitation; Debra Brunner, City Clerk; and Jacqueline Ellis, Deputy City Clerk) to serve as the Election Commissioners for the June 6, 1989, municipal general election. The three commissioners were responsible for conducting the June 6 election and were to resolve ballot disputes after the votes were cast.
Prior to the March 31, 1989, qualifying deadline, Wanda Stringer and Darryl Johnson filed petitions to run for the positions of mayor and alderman respectively in the June 6, 1989, municipal general election. At the time of Stringer's qualifying petition, she was serving as a member of the Bolivar County Election Commission. According to Stringer, the Election Commissioners for the City of Mound Bayou and the other candidates know of her membership on the Bolivar County Elections Commission. Nevertheless, candidate Stringer was certified by the city election commissioners and placed on the ballot along with Earl Lucas and two other candidates.
The commissioners also certified the candidacy of plaintiff Darryl Johnson and placed his name on the alderman's ballot along with ten other candidates, including defendant Felix Tate.
On June 6, 1989, seven hundred eighty-eight (788) registered voters in Mound Bayou went to the polls and voted in person. Ninety six (96) voters, mostly disabled and elderly citizens, had already cast their votes by absentee ballot prior to election day. At the close of the polls on election day, and after counting the uncontested absentee ballots, Wanda Stringer had received 332 votes with Earl Lucas receiving 228 votes. In the alderman's race, Darryl Johnson was the candidate receiving the third largest vote tally with 321 votes. Defendant Tate was the sixth highest vote getter with 306 votes.
The next day, the election commissioners and the candidates met to discuss the validity of the sixty (60) contested absentee *1353 ballots. Objectors complained that the ballots should be excluded because forty-nine (49) of the sixty (60) contested ballots had been attested by Vickie Lucas, the daughter of incumbent Mayor Earl Lucas. Objectors further claimed that the statutory procedures for the overall handling and certification of the absentee ballots had been disregarded and that their reliability could no longer be assured.
The testimony regarding the objectors' first complaint evidenced that Vickie Lucas was called by the City Clerk, Ms. Deborah Brunner, to attest the absentee ballots because Lucas was a notary public. Ms. Brunner explained that she had used Ms. Lucas for the Clerk's notary work in the past and had also asked for Lucas' assistance for other office duties over the years. Lucas was an employee of the senior employment program under the supervision of Mr. Joseph Woods and was the only notary public in City Hall.
Concerning the objectors' second complaint  that the absentee ballots were improperly attested and handled  defense counsel and City Clerk Brunner went through each contested ballot and explained why each voter requested an absentee ballot. Ms. Brunner testified that of the sixty (60) contested ballots, thirty-three (33) had been filled-out in the City Clerk's Office. Brunner stated that she attested three (3) of the ballots. She and Vickie Lucas attested four (4) ballots together. Lucas and Jacqueline Ellis attested one (1) ballot together, and Lucas attested twenty-five ballots (25) on her own.
Brunner next testified that the remaining twenty-seven (27) absentee ballots were executed outside of the City Clerk's office. Brunner stated that Vickie Lucas and Donald Peterson attested one (1) of the contested ballots together. Avis Lucas attested six (6) ballots on her own. Helen Thompson attested one (1) ballot by herself. And Vickie Lucas attested nineteen (19) absentee ballots alone. Ms. Brunner stated that each of the attesting witnesses was known personally by her and that each witness was over the age of eighteen and had never been convicted of a felony. Brunner knew of no reason why any of the attesting witnesses would have been disqualified from this responsibility.
For the plaintiffs, Mound Bayou resident Leroy Holliman testified that he was a seventy-eight year old registered voter of that city. He stated that he never requested an absentee voting ballot but that Vickie Lucas flagged him down while he was in town a few days before the election. Holliman testified that Lucas said that he and his wife should vote absentee just in case they could not make it into town on election day. Mr. Holliman stated that he and his wife both signed a piece of paper but that he did not recall a list of candidates on that document. The witness stated that he was provided with no absentee instructions.
Also for the plaintiffs, candidate Darryl Johnson testified that prior to the election, he visited in the home of Mr. and Mrs. Robert Booker. Johnson stated that when he arrived, alderman candidate Donald Peterson was at their home with an absentee ballot. He stated that he noticed that the ballot had already been notarized by Vickie Lucas.
In canvassing the sixty (60) contested absentee ballots, Darryl Johnson received two (2) additional votes plus one vote from the curbside ballot for a total of 324. Defendant Felix Tate received an additional fifty-four (54) votes, giving him a total of 360 which propelled him to the position of the fifth highest vote getter.
The counting of the sixty (60) contested ballots did not change the results of the mayoral race. Wanda Stringer received one (1) vote giving her a final tally of 334 votes. Earl Lucas received an additional fifty-nine (59) votes for a total of 287 votes.
The election commissioners did not immediately certify the results of the general election and instead received a letter from candidate Earl Lucas asserting the invalidity of Wanda Stringer's candidacy for mayor. The election commissioners considered Ms. Stringer's membership on the Bolivar County Election Commission and determined that she was ineligible for the position of mayor based upon the decision of this Court in Meeks v. Tallahatchie County *1354 Election Commissioners, 513 So.2d 563 (Miss. 1987). The commission certified incumbent Mayor Earl Lucas as the winner of the election based upon his receipt of the second greatest number of votes.
This action was instituted in the Circuit Court of Bolivar County. On August 18, 1989, this cause came before Special Judge Eugene Bogen on plaintiff's Motion for Summary Judgment and defendant's cross-motion. Judge Bogen concluded that the Meeks decision would require the disqualification of Wanda Stringer because she was a member of the election commission in Bolivar County.
On August 21, 1989, a trial on the merits was held on the second part of the case contesting the certification of Felix Tate as one of the winners in the alderman's race over plaintiff Darryl Johnson. At the conclusion of the plaintiff's case, the defendant moved for a directed verdict asserting that plaintiff had failed to carry the burden of proof necessary to present the issue to the jury. Special Judge Bogen agreed with defendant's argument and ruled that plaintiff's evidence should be excluded and that a directed verdict should be granted.
On September 6, 1989, the trial court entered its orders granting summary judgment in favor of Earl Lucas and a directed verdict in favor of Felix Tate. On October 6, 1989, the trial judge entered an order imposing Rule 11 sanctions in the form of attorney's fees against Wanda Stringer.
This appeal followed.

II.
Wanda Stringer alleges on appeal that the lower court committed reversible error when it found that she was disqualified, because of her membership on the Bolivar County Election Commission, to run for the municipal office of mayor of Mound Bayou under the mandate of Miss. Code Ann. § 23-15-217 as interpreted by this Court in Meeks v. Tallahatchie County Election Commission, 513 So.2d 563 (Miss. 1987). This portion of the appeal comes from the grant of summary judgment. As such, our standard of review is de novo. Short v. Columbus Rubber and Gasket Co., Inc., 535 So.2d 61, 63 (Miss. 1988); Mississippi Road Supply Co., Inc. v. Zurich-American Insurance Co., 501 So.2d 412, 414 (Miss. 1987).
First, Stringer asserts that the decision in Meeks has no application in this matter because she was a county election commissioner seeking a municipal office. In Meeks, the plaintiff was the duly elected Chairman of the Tallahatchie County Election Commission. As the next county election drew near, plaintiff tendered his resignation from that group and filed documents qualifying for the position of justice court judge. When the Democratic Party Executive Committee met to consider the certification of the candidates, they refused to certify plaintiff's candidacy reasoning that he had acted as an elections commissioner and was disqualified by Miss. Code Ann. § 23-15-217 (Supp. 1987).[2] Meeks immediately brought suit.
After an unfavorable decision in circuit court, Eddie Meeks perfected his appeal to this Court. On petition for rehearing, this Court concluded that the provisions of § 23-15-217 indeed prevented Meeks' candidacy for justice court judge. The Court found that the statute prevented any election commissioner from seeking any other office during the term for which he had been elected. The Court stated:
Although its wording is general, we find the meaning of Section 23-15-217 reasonably clear. The statute provides two disqualifications upon a county election commissioner offering himself as a candidate for any other office. First, the commissioner is disqualified with respect to "any election for which he may have been elected." The elections commissioners are elected for four year terms. They are elected to act with respect to all general elections held within those terms. In addition, they have many other duties prescribed by statute. *1355 The first disqualification in Section 23-15-217 means that no person holding the office of elections commissioner may be a candidate for election to any other office at any election held or to be held during the four year term for which that person has been elected elections commissioner.
Second, an election commissioner is disqualified from seeking further office at any election "with reference to which he has acted" as an election commissioner. The meaning of this language seems quite apparent, although it overlaps the first disqualification and is arguably redundant. The commissioner may not be a candidate for any other office in any election with respect to which he has taken any action in his official capacity. An exception to both disqualifications is that an incumbent election commissioner may be a candidate for reelection.
Meeks, 513 So.2d at 566-67 (emphasis added).
Stringer suggests that the above cited authority is not applicable in this case because she was a county election commissioner seeking municipal office. She submits that the City of Mound Bayou has its own municipal election commission and that it is responsible for conducting municipal elections. Stringer says that she had no authority or jurisdiction, and took no action with respect to the municipal election at issue as it was wholly controlled and conducted by the City of Mound Bayou Election Commission. As a result, she should not have been disqualified under the statute, or under Meeks, because she did not take any action, nor did she have the authority to take any action, with respect to the June 6, 1989, municipal election.
Next, Stringer asserts that applying the decision in Meeks to the facts of this case would be an extension of the prohibitions of § 23-15-217 as well as the Meeks ruling. Being penal in nature, Stringer claims that the statute and case law should not be extended by implication and should be strictly construed. In Quick Shops of Mississippi, Inc. v. Bruce, 232 So.2d 351, 353 (Miss. 1970), the Court said that "[i]t is a fundamental principle of statutory construction that statutes penal in nature must be strictly construed." Because the lower court expanded the holding in Meeks, it should be deemed to have violated the principle in Quick Shops. As such, that court's ruling should be reversed.
Finally, Stringer suggests that to affirm the decision of the trial court would result in an infringement of appellants' fundamental right to vote. She asserts that the State's legitimate interest in protecting the integrity of the process is not jeopardized by the absence of a restriction against county election commissioners running for municipal office. She asserts that the State's interest in maintaining the integrity of the electoral process is at stake under our facts because applying the restriction in question denies the right to vote to more than three hundred (300) qualified voters in Mound Bayou. For this reason alone, she contends that the lower court's ruling should be reversed.
Lucas addresses this assignment of error by suggesting that § 23-15-217 and Meeks are dispositive on appeal. Section 23-15-217 provides as follows:[3]
(1) A commissioner of election of any county shall not be a candidate for any other office at any election held or to be held during the four-year term for which he has been elected to the office of commissioner of election or with reference to which he has acted as such; and all votes cast for any such person at such election shall be illegal and shall not be counted, except that he may be a candidate for the office of county election commissioner.
In interpreting the above statute, this Court stated:

*1356 Section 23-15-217 means that no person holding the office of elections commissioner may be a candidate for election to any other office at any election held or to be held during the four year term for which that person has been elected elections commissioner.
... .
Perhaps more so than is the case with any other public official, the integrity of the office of Elections Commissioner must be totally beyond compromise or even perception of the possibility of compromise. The legislature has enacted that elections commissioners shall totally remove themselves from any taint or hint of suspicion or partisanship. They must be aloof from partisan politics as much as judges, if not more so. For what is at stake is public confidence in our system of self government. By law, once Eddie Meeks or anyone else assumes the office of Elections Commissioner, he becomes obligated to stay out of any other electoral endeavor for the term of his office, period. If this seem harsh, it is certainly less so than the adverse impact upon the public interest if our people come to doubt the integrity of the system.
Meeks, 513 So.2d at 566, 569.
Considering the Meeks decision, Lucas submits that Stringer was not a proper candidate for the position of mayor of Mound Bayou. From July 2, 1985, until July 1, 1988, Stringer, as City Clerk and Registrar, had absolute authority and control over the voter rolls for the City of Mound Bayou. From 1984 to the date of trial, Stringer, as county election commissioner, has had the statutory duty to purge and revise the registration and pollbooks of the several voting precincts in Bolivar County.[4] With these mandatory duties, the perception or possibility of compromise would serve to erode the public trust. The Meeks court considered the effect of these statutory duties when it stated:
[T]he statute imposes a disqualification upon an election commissioner who has acted with respect to an election. Evidence below and argument here focused upon the statutory duty of the elections commissioners to purge the county voter roles in the early part of each year... . This statute mandated that Meeks and his fellow commissioners take action which could have significant effect on the 1987 primary and general elections... .
Meeks' response on this point is anomalous. He claims that he has not "acted" as an elections commissioner with respect to the 1987 elections because he didn't do what he was statutorily required to do under Section 23-15-15[3]. Meeks says that in point of fact the commissioners did not meet and purge the registration and poll books... .
In sum, candid application of Section 23-15-217 to Meeks renders him disqualified as a candidate for Justice Court Judge in the 1987 election  or for any other office (except election commissioner) in any other election to be held during the four year term which began in January, 1985. He is disqualified, notwithstanding that as election commissioner he may have in fact done nothing toward the preparation for and conduct of the 1987 elections.

Meeks, 513 So.2d at 567-68 (footnote omitted) (emphasis added). In light of the above, Lucas contends that the lower court was correct in finding that Stringer was ineligible for the office of mayor.
The State may legitimately reserve the right to run for elected office to those candidates who are properly qualified for that position. See Johnson v. Hood, 430 F.2d 610, 612 (5th Cir.1970) (right to vote in state elections not necessarily secured by constitution).
The decision in Meeks applies to the facts of this case because Stringer had the statutory duty to purge and revise the voter rolls for the several precincts in Bolivar County. This duty and the mandate to keep the election commissioners above suspicion are in conflict. Also, the Meeks decision is very broad in stating that "no person holding the office of elections commissioner *1357 may be a candidate for election to any other office at any election held or to be held during the four year term for which that person has been elected elections commissioner." Meeks, 513 So.2d at 566 (emphasis added). No exemption was made, and indeed should not have been made in light of the above statutory duty, for county election commissioners who later decide to run for municipal offices.

III.
Stringer next asserts on appeal that where state law requires the disqualification of a candidate after an election is over, the law does not require that the candidate receiving the next highest vote count be declared the winner. Corpus Juris Secundum, provides:
Votes cast for a ... disqualified, or ineligible person, although ineffective to elect such person to office, are not to be treated as void or thrown away but are to be counted in determining the result of the election as regards the other candidates. Accordingly, the general rule is that the fact that a plurality or a majority of the votes are cast for an ineligible candidate at a popular election does not entitle the candidate receiving the next highest number of votes to be declared elected. In such case the electors have failed to make a choice and the election is a nullity.
29 C.J.S. Elections § 243, at 676-77 (1965) (footnotes omitted). Stringer suggests that the law of this State is in agreement with the principle set out above. That being, that when a significant number of votes have been rendered illegal or ineligible, the election is a nullity and a special election should be held.
In Noxubee County Democratic Executive Committee v. Russell, 443 So.2d 1191 (Miss. 1983), this Court considered the appropriate form of relief when an election contest had been successfully challenged. The Court concluded that a two pronged test would be employed to determine when a special election would be required. First, a special election would be called when "enough illegal votes were cast for the contestee to change the result of the election... ." Russell, 443 So.2d at 1197. Next, a special election would be called if "so many votes are disqualified that the will of the voters is impossible to discern." Id. In applying the two pronged test, the Court noted that a disenfranchisement of a significant number of voters would cast enough doubt on the results of an election to warrant its nullity. "[I]f more than thirty percent of total votes have been disqualified, a special election will be required." Russell, 443 So.2d at 1198.
Under the facts of our case, more than forty (40) percent of the total votes were cast in favor of Wanda Stringer. Under the Russell test above, a special election would be required.
Lucas, however, argues that the mandates of Russell do not apply to this case because: (1) the votes cast for Stringer were never found to be illegal; and (2) the circuit court is without authority to order a special election if the election contest arises from a general election.
In the early case of May v. Young, 164 Miss. 35, 143 So. 703 (1932), this Court reviewed the effect of a candidate's dis-qualification in regard to the votes cast in his favor. Upon consideration of the validity or nullity of these votes, the Court simply held that a vote cast for a candidate disqualified from holding office does not "render the votes cast for him illegal." May, 164 Miss. at 42, 143 So. at 704. This holding, according to appellee, would render the principles of the Russell case inapplicable, that decision being based upon votes that were found to be illegal. However, it should be noted that § 23-15-217 specifically provides that a vote cast for an election commissioner "while in office" is illegal. Section 23-15-217 provides, in pertinent part, the following:
(1) A commissioner of election of any county shall not be a candidate for any other office ... and all votes cast for any such person at such election shall be illegal and shall not be counted... .
Therefore, the decision of May and the mandates of § 23-15-217 are in conflict.
*1358 In his bench opinion, Special Judge Eugene Bogen found that the circuit court lacked the authority to order a new election because of the mandates of Miss. Code Ann. § 23-15-951 (Supp. 1988) and May. Section 23-15-951 provides the statutory authority to impanel a jury to determine which candidate received the greatest number of votes when a general election is contested. Section 23-15-951 provides in part:
Except as otherwise provided by Section 23-15-961, a person desiring to contest the election of another person returned as elected to any office within any county, may, within twenty (20) days after the election, file a petition in the office of the clerk of the circuit court of the county, setting forth the grounds upon which the election is contested; ... and the court shall, at the first term, cause an issue to be made up and tried by a jury, and the verdict of the jury shall find the person having the greatest number of legal votes at the election. If the jury shall find against the person returned elected, the clerk shall issue a certificate thereof; and the person in whose favor the jury shall find shall be commissioned by the Governor, and shall qualify and enter upon the duties of his office.
(emphasis added).
In interpreting the predecessor to § 23-15-951, this Court, in May, stated:
The only question which the court below was authorized to investigate and determine was which of the parties hereto received "the greatest number of legal votes at the election." Section 6258, Code 1930. Pradat v. Ramsey, 47 Miss. 24; Weisinger v. McGehee, 160 Miss. 424, 134 So. 148.
May, 164 Miss. at 40, 143 So. at 703. Considering the above, Lucas contends that the lower court was indeed without authority to order a new election having only the power to determine which candidate received the greatest number of legal votes.
Stringer challenges the lower court finding that Lucas received the largest number of legal votes and was, therefore, the winning candidate. Section 23-15-951 provides that a circuit court has the authority to impanel a jury to determine who received the "greatest number of legal votes at the election." In this cause, the impanelment of a jury was not necessary because the trial judge could readily conclude that candidate Lucas received the greatest number of legal votes. This determination was clearly based upon the mandates of § 23-15-217 which provides that all votes received by a disqualified election commissioner "shall be illegal and shall not be counted... ." With Stringer's votes uncounted, candidate Lucas was the clear winner and he was certified as mayor. This is not the end of our inquiry.
In O'Neal v. Simpson, 350 So.2d 998 (Miss. 1977), cert. denied, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 532 (1978), this Court stated that when a significant number of legal votes have been rejected, or illegal votes received, an inquiry must be made to determine if the general election conformed to the will of the voters and if a special election should be called. Id. at 1011. In applying the two pronged test set out in Russell, it is evident that a special election was warranted in the case at hand because enough illegal votes were cast to change the outcome of the election and more than thirty percent of the total votes were disqualified. See Russell, 443 So.2d at 1197. Due to Stringer's disqualification, more than forty (40) percent of the votes cast have been rendered invalid and without effect. To allow the election to stand as it now does would certainly be contrary to the will of the voters in Mound Bayou.

IV.
Finally, Stringer asserts that the lower court erred in ordering sanctions against her on the grounds that her claims were frivolous or filed for the purpose of harassment and financial ruin. In his October 6, 1989, Order, Special Judge Eugene Bogen found that "[i]n seeking the office of mayor of Mound Bayou and in filing suit in this case, Plaintiff Wanda Stringer has chosen to ignore the law at her peril. For filing a frivolous lawsuit, Plaintiff Stringer is obligated and hereby ordered to pay Defendant *1359 Lucas' expenses and attorney's fees." Judge Bogen found that the sum of $4,218.81 was an appropriate award of attorney's fees and granted this sum to Lucas pursuant to M.R.C.P. 11(b).
The question is whether Stringer's original lawsuit had a "hope of success." Bean v. Broussard, 587 So.2d 908, 912 (Miss. 1991) (quoting Tricon Metals & Services, Inc. v. Topp, 537 So.2d 1331, 1336 (Miss. 1989)). Rule 11(b) provides, in pertinent part:
If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.
This Court has analyzed the factors for establishing an action for frivolous claims in the decision of Nationwide Mutual Insurance Company v. Evans, 553 So.2d 1117 (Miss. 1989). In Nationwide, the Court enumerated a two part test for evaluating a frivolous claim under Rule 11(b). The Court explained that the rule contains twin standards, first, frivolousness, and second, harassment or delay. Nationwide, 553 So.2d at 1120.
The first element of the test is frivolousness. The standard used involves the following question:
Our question is whether [the litigant], giving it the benefit of reasonably competent legal advice, had any hope of success on its claim... . Our inquiry is an objective one to be exercised from the vantage point of a reasonable party in [the litigant's] position as it filed ... its claim.
Nationwide, 553 So.2d at 1120 (quoting Tricon Metals & Services, Inc. v. Topp, 537 So.2d 1331, 1335 (Miss. 1989)).
Under the frivolousness analysis, this lawsuit cannot be deemed frivolous in light of the conclusion that the Circuit Court misapplied the law of this State when it held that it could not call for a special election. The law appears clear that a special or new election is in order when a significant number of voters have been disenfranchised.
The remaining element of the analysis of Rule 11(b) is whether a pleading is filed for reasons of harassment or delay. In Bean, the Court stated that "[g]enerally speaking, where a plaintiff has a viable claim the complaint cannot be deemed as filed for purposes of harassment." Bean, 587 So.2d at 913. There is no evidence on this record to show that Stringer had harassment or delay in mind when she instituted these proceedings.

V.
The lower court was correct in its interpretation and application of Meeks and § 23-15-217. Stringer, as a member of the Bolivar County Election Commission, is not eligible to run in the mayoral race. All votes cast for Stringer were illegal. The lower court erred, however, in its determination that a special election should not be held. Over forty (40) percent of the votes cast were illegal and enough illegal votes were cast to change the ultimate result of the election. See Russell, 443 So.2d at 1197. As a result, the award of Rule 11(b) sanctions was improper because Stringer's suit was not frivolous or filed for harassment or delay.

VI.
Darryl Johnson asserts that the integrity of the votes cast by absentee ballot was compromised because of total disregard and substantial departure from fundamental provisions of the absentee balloting law, and that the trial court erred in excluding all of his proof at the close of the trial and granting a directed verdict in favor of Tate.[5] The proof shows that Darryl Johnson was one of the five candidates *1360 receiving the greatest number of votes in the alderman's race, having received 316 votes to defendant Tate's 290 from the canvassing of the voting machines. The canvass of twenty-two (22) absentee ballots the night of the election resulted in five (5) additional votes for appellant Johnson, who remained one of the top five vote getters with 321 votes. However, the counting of the sixty (60) contested absentee ballots on the day following the election resulted in defendant Tate receiving an additional fifty-four (54) votes and Darryl Johnson an additional three (3). This gave candidate Tate a total 360 votes and candidate Johnson a total of 324 votes.
On appeal to this Court, Darryl Johnson argues that by counting the absentee votes at issue, the integrity of the June 6, 1989, election was destroyed and that the will of the voters of Mound Bayou was never ascertained. He suggests that there was such a fundamental departure from the statutory procedures regulating the handling and use of absentee ballots that the sixty (60) contested ballots at issue should be thrown out. Because the matter comes to this Court from the grant of a directed verdict, the following standard of review should be observed:
The Circuit Court  and this Court on appeal  are required to consider the evidence in the light most favorable to the plaintiffs ... giving those plaintiffs the benefit of all favorable inferences that may reasonably be drawn from the evidence. Unless the evidence is so lacking that no reasonable jury could find for plaintiffs, the motion must be denied.
Wall v. Swilley, 562 So.2d 1252, 1256 (Miss. 1990).
First, Darryl Johnson asserts that all ballots attested by Vickie Lucas should be discarded. He suggests that Ms. Lucas was not acting as a de facto public official when attesting ballots for the city clerk but rather was campaigning for her father and his political cronies. According to Miss. Code Ann. § 23-15-631(a) (Supp. 1987), "[a]ll absentee voters ... who mark their ballots in the county of the residence shall use the registrar of that county as the witness." (emphasis added) In a municipal election, the city clerk performs the duties of the county registrar. Johnson contends that the statutory procedures were disregarded when someone other than Deborah Brunner attested the absentee ballots.
Tate addresses the Vickie Lucas issue by arguing that Ms. Lucas was acting as a de facto city clerk when attesting the absentee ballots at issue. The testimony of Deborah Brunner was to the effect that Ms. Lucas was acting as an assistant deputy clerk and that Ms. Lucas had performed services for the City Clerk's Office before. Tate maintains that if Ms. Lucas is found to have been acting as a de facto city clerk, then her acts as such would be valid. In Barnes v. Ladner, 241 Miss. 606, 131 So.2d 458 (1961), this Court stated:
[T]he rule is well settled that the acts of a de facto officer are valid. The official acts of any person in possession of a public office, and exercising the functions thereof, in regard to all persons interested or affected thereby, are valid, whether such person be lawfully entitled to hold office or not. Section 4045, Code of 1942, Rec. The official acts of the county election commissioners who were in possession of the offices and exercised the functions thereof in the matter of the holding of the election in this case were valid, and the alleged invalidity of their appointment, if proved, would have no bearing upon the validity of the election.

Barnes, 241 Miss. at 618, 131 So.2d at 462 (emphasis added). Tate suggests that no error should be found with respect to Johnson's argument on appeal.
Next, Johnson alleges that six (6) absentee ballots should be discarded because they contained no signature on the line provided for the attester's certification. According to Miss. Code Ann. § 23-15-641(3) (Supp. 1987), "[i]f an affidavit is required and the officials find that the affidavit is insufficient, ... the envelope shall not be opened and a commissioner shall write across the face of the envelope `REJECTED' ... ."
*1361 Continuing, Johnson alleges that all absentee ballots are defective for want of the printed instructions pursuant to § 12-15-631. That statute provides, in part, that "[t]he registrar shall enclose with each ballot sent to an absent elector separate printed instructions furnished by him containing the following... ." There is no evidence showing that City Clerk Brunner complied with this provision.
Next, Johnson asserts that the results of the absentee ballots cannot be assured when individuals, even candidates, were delivering the absentee ballots to voters. Absentee voters who are unable to vote personally at the City Clerk's office are to be mailed their absentee ballot. Miss. Code Ann. § 23-15-715(b) (Supp. 1987). This practice may have been violated by the actions of candidate Donald Peterson and Ms. Lucas.
The testimony at trial alleged that Donald Peterson, a candidate for the position of alderman, was seen delivering an absentee ballot in the home of Mr. and Mrs. Robert Booker. Also, witness Leroy Holliman testified that he voted by absentee ballot after Ms. Vickie Lucas stopped him on the street and asked him to do so. Johnson asserts an inherent taint on votes was accomplished in this manner.
Considering the above, Johnson presented enough proof, especially when the evidence is considered in the light most favorable to him, to withstand a motion for directed verdict. In Riley v. Clayton, 441 So.2d 1322 (Miss. 1983), this Court stated the general rule for determining when violations of voting procedures would render the votes cast invalid. The Court held:
The key in deciding whether an act not in strict compliance with the statutory election procedures renders that election void is whether the act is such a total departure from the fundamental provisions of the statute as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain.
Riley, 441 So.2d at 1328.
It is imperative that the appropriate elected officials strictly adhere to the statutes concerning absentee ballots. Recent elections appear to have had wholesale disregard for law regulating the use of absentee ballots. This Court, where called on to do so, will require strict compliance and we call on others to do likewise.
A motion for directed verdict was inappropriate in the face of a wealth of statutory election violations. As a result, this cause is reversed and remanded to the Circuit Court of Bolivar County where a jury will be impaneled to determine which candidate received the greatest number of legal votes.

VII.
The lower court's determination that Stringer is not qualified to run as a candidate in the mayoral race is affirmed. The decision to declare Lucas the winner, however, is reversed and rendered, and this Court orders that a special election be held. The award of Rule 11(b) sanctions is also hereby reversed and rendered.
Finally, the directed verdict entered in favor of Tate is reversed and remanded to the lower court where a jury will be impaneled to determine the outcome of the alderman's race.
AFFIRM AS TO THE SUMMARY JUDGMENT DISQUALIFYING STRINGER; REVERSED AS TO SUMMARY JUDGMENT FOR LUCAS; REVERSED AND RENDERED AS TO SPECIAL ELECTION; REVERSED AND RENDERED AS TO SANCTIONS ON STRINGER; REVERSED AS TO DIRECTED VERDICT IN FAVOR OF TATE AND REMANDED FOR JURY DETERMINATION.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN and McRAE, JJ., concur.
BANKS, J., dissents with separate written opinion.
ROBERTS, J., not participating according to supreme court internal rules.
BANKS, Justice, dissenting:
I dissent from so much of the majority opinion which would hold for the first time *1362 that county election commissioners are barred during their term in office from seeking election to municipal office. The reason is simple. County election commissioners have nothing whatever to do with municipal elections or municipal voting rolls. How then can a municipal election be one "for which they are elected?" See, Meeks v. Tallahatchie County, 513 So.2d 563, 566 (Miss. 1987)
Our statutory scheme explicitly provides for municipal election commissioners, who perform all the duties of the county election commission with regard to municipal elections. Miss. Code Ann. § 23-15-221 (1972). In apparent recognition of this fact, the majority suggests that because county election commissioners purge the voting rolls of Bolivar County, Ms. Stringer may have acted with respect to the election in question. This argument overlooks the fact that municipalities have separate voting rolls which are purged, if necessary, by the municipal registrar, not the county election commission. Id.; Miss. Code Ann. §§ 23-15-31 and -35 (1972).
The majority notes that for a time Ms. Stringer was the municipal registrar. The fact is, however, that this position has nothing whatever to do with her duties as a county election commissioner and there is no prohibition, statutory or otherwise, preventing a registrar, county or municipal, from seeking office during the term for which they were elected as such.
In Meeks we tied the prohibitory statute, Miss. Code Ann. § 23-15-217, to duties imposed upon commissioners during the term for which they were elected, whether or not those duties were actually performed. 513 So.2d at 567-568. That was a sensible reading of the statute, despite the fact the previous practice in this state had been to the contrary. Id. at 568. We did not suggest, however, that the statute extended to elections over which the election commission had no responsibility whatever at any time. Of course, it may be argued that because the legislature amended the statute subsequent to Meeks and that the amended statute, fairly read, applies to all elections in that it does not continue the "elections for which he may have been elected" language.
The better interpretation in my view is that the legislature was making explicit our interpretation in Meeks, that the language covers elections, over which the commissioner has statutory responsibility, for the entire four years, regardless of whether the commissioner actually performs duties with regard to a particular election. There is simply no reason for extending this prohibition to the elections of another jurisdiction (another county, where, for example, the commissioner has resigned and moved or a municipality) for which the commissioner has no responsibility.
Because I believe that the statute should be read to speak to elections with regard to which the commissioner has responsibility, I dissent.
NOTES
[1] Ms. Stringer was re-elected to this position in November of 1988.
[2] The statute interpreted by this Court in Meeks, Miss. Code Ann. § 23-15-217 (Supp. 1987), is essentially the same as the amended version, Miss. Code Ann. § 23-15-217 (Supp. 1989), which is applicable to this case. See Meeks, 513 So.2d at 565-66.
[3] After Laws, 1991, ch. 613, § 1 is effectuated under Section 5 of the Voting Rights Act, Section 23-15-217 will read as follows:

(1) A commissioner of election of any county may be a candidate for any other office at any election held or to be held during the four-year term for which he has been elected to the office of commissioner of election or with reference to which he has acted as such; provided that he has resigned from the office of election commissioner before January 1 of the year in which he desires to seek the office.
[4] See Miss. Code Ann. § 23-15-153 (Supp. 1988).
[5] According to Appellee's Brief, Felix Tate passed away on October 24, 1990. On January 15, 1991, pursuant to an opinion from the Attorney General's Office, the City of Mound Bayou held a special election. Appellant Darryl Johnson did not qualify to run and William Crockett, Jr., was elected to fill appellee Tate's seat on the Board of Alderman.